2-16-0873 People of the State of Philadelphia, Plinkett-Napolee, Alexander v. Castillo, Dependent of Pellissippi, arguing on behalf of the Dependent of Pellissippi, Mr. Jonathan T. Pilsner, arguing on behalf of the Plinkett-Napolee, Ms. Sandy A. Smith, Mr. Pilsner, you may proceed. Thank you. As you're listening, please pay attention to the time signal. If additional time is necessary, we'll so indicate. Thank you. May it please the Court. Counsel. My name is Jonathan Pilsner. I'm with the Office of the State Appellate Defender, and I represent Mr. Castillo in this matter. Mr. Castillo is appealing from the dismissal of his post-conviction petition at the first stage. On appeal, we raise one issue regarding a David Ryman. Mr. Ryman was a jailhouse informant who testified at Mr. Castillo's trial. His testimony was important because Mr. Ryman is the only person in this case who told jurors that Mr. Castillo himself confessed to killing two people in a Rockford home. No other evidence at trial, although there was other evidence, had Mr. Castillo saying that he committed these two crimes. At trial, however, counsel attempted to impeach Mr. Ryman with the range of penalties he was facing. Mr. Ryman, as I said, was a jailhouse informant. He was in custody at the time facing his own charges when he apparently testified that he had a conversation with Mr. Castillo about and in which Mr. Castillo confessed. Counsel tried to bring up to the jurors that Mr. Ryman had received a seven-year sentence on a burglary charge. When he attempted to illustrate to the jury what that meant in the grander scheme of things, what did seven years on a burglary charge mean? And under Illinois law, the trial court prohibited him from doing that. Was there not testimony, though, by Mr. Ryman that the state hadn't offered him a deal? And then also testimony somehow brought in through the state that he was not offered a deal? There was testimony that there was not an express deal between him and the state. But what counsel sought to do with the range of penalties was to illustrate not just that there was an agreement or that there was sort of an agreement or try to rebut that, but to illustrate what Mr. Ryman's subjective bias or motive in lying might have been to create that argument. It goes beyond just whether or not there was an agreement with the state. It goes into what Mr. Ryman's motivation was. What was he thinking? When he's sitting in jail facing a Class I or arguably, as I've raised in my brief, possibly a Class X by background sentencing range, the jurors had a right, I would argue, sorry, counsel had a right to bring it up to the jurors to say, listen, this is seven years, and yes, he doesn't have an agreement with the state, but look at what's motivating him. He's facing between six and 30 years in prison, and now he comes forward with this illustration. So I would argue it goes beyond just an agreement, and that's what counsel was trying to highlight. What counsel said expressly, it goes to Mr. Ryman's bias or motive. It's his subjective bias. But that was the significance of that really was diminished, was it not, because his credibility was severely compromised anyway because of the fact that he had changed his mind or had a, quote, memory loss shortly before he testified, and that was known as well. So the significance of that really was diminished, was it not? I disagree that, admittedly, yes, he was impeached. Obviously, he had changed his story a number of times, and it's sort of gone back and forth. But at trial, when he is in front of the jurors, the first story that he says is, that man confessed to me. He said he killed those two people. Now, counsel could have gotten up and painted a complete picture of, wait a second, why do you keep shifting what's really behind everything and really damaged his credibility completely. It should have been a full and comprehensive impeachment, and it wasn't because the trial court improperly, in our argument, limited that impeachment. Was Ryman's statement to the police where he told them about the defendant's confession, was that recorded? Was it recorded? I don't remember seeing it in the record that it was recorded. He made a number of statements. I believe some of them were documented with notes with different, like with the state's attorney, if I remember correctly. I don't have the specifics of that first conversation in my mind, and I don't remember that being in the record. And you cite Triplett in your briefs. Yes. And Triplett does stand for the proposition that the defense does not have to show if there's been promises, that you're entitled to inquire whether that there's evidence of a promise or even if it's imaginary. Just theoretical, correct? That's correct, and I think that kind of cuts to the heart of what you were talking about earlier. Yes, there may not have been a promise, but we don't know what was inside Mr. Ryman's brain, and that's kind of what we're looking at here. This is a very subjective viewpoint. We're saying subjectively, what does Mr. Ryman believe, or what could counsel argue that Mr. Ryman believes? And Kyles v. Whitney stands for the proposition that if you taint some evidence, that may have an effect on other evidence produced by the police, correct? I agree with that as well, yes. So the identification testimony, which was solicited by the police, that may have cast a shadow over that as well. Once the shadow starts to begin to, once the shadow is cast, I think it grows. I think that's a very good way of putting it. And considering that there were some identification issues in this case with the young boy who made the identification, as I note in my, looking at this more globally, as I note in my brief, we have the identification of the young boy who says that he saw this whole incident happen. But what we don't have is an actual confession. Police interviewed Mr. Castillo a number of times, but he never said point blank, yes, I did it. Well, he gave a series of statements that were problematic for the defense. Would you agree? I would agree that they were problematic. That's a very diplomatic way of putting it, yes. He puts himself at the scene. He admits to going back after he sees these two people slaughter, takes his cell phone back and doesn't call the police. I mean, that's the problem with this case for you, is the prejudice problem. I agree that that's certainly a hurdle that I've got to take a good leap over, but allow me to address just a few points. Mr. Castillo did have a relationship with these two victims. He established it. It was a relationship, I'll be frank, and I don't mean to dirty the victims, but it was a relationship based upon unsavory behavior on all parties concerned. So, arguably, at this stage, arguably, Mr. Castillo's version of events could be cut two ways. It could be a man trying to evade guilt or a man who knows that he's done some wrong things and is trying to evade the fact that this was a drug-selling conspiracy that they were all partaking in and that he was caught up in something. I think that because it cuts both ways, it's not completely overwhelming that his statement's standing alone, which is why Mr. Weinman's statement was such a fantastic cure, because Mr. Castillo admits, yes, his stories are inconsistent. I can't get around that fact, and I won't. But he doesn't say, yeah, you know what, finally, he doesn't break down and say, yes, I did it. He stays firm to that. But yet this other person, this jailhouse informant, comes in and says, no, you know what, when we were in custody, he absolutely did what he wouldn't do to the police, and he confessed. He said, I shot them both. And that's why, arguably, at this stage, the prejudice is still there, because if you look at all of the evidence in total, not one piece fully condemns this, condemns a complete verdict in this. Isn't that the way most murder cases are? I mean, you have circumstantial evidence, the totality of the evidence that comes in, which makes the juror, the fact finder, make a determination as to whether or not there is guilt or innocence. In this particular case, you have a lot of circumstantial evidence, separate and apart from this jailhouse snitch. So, you know, like Justice Burkett said, the second prong, you have to show that there's reasonable probability that but for this jailhouse snitch's cross-examination, there would have been a not guilty. How can we say that? How can we see that after all of this circumstantial evidence? I think two things. A, this is a first-stage dismissal, so it's only an arguable level of prejudice. The Supreme Court has been clear that that is a diminished, as opposed to the usual Strickland test at this stage. So keeping that in mind, you highlighted that, yeah, Justice, you were absolutely right. This was a case built on a lot of circumstantial evidence, and it stacks up, like any homicide, any number of cases. But the jury, when weighing that circumstantial evidence, has a right to know where this evidence is coming from and what is motivating this evidence. And again, what sort of tied this- This one piece of evidence. And I think this one piece of evidence, which is the confession, that piece of evidence ties everything else together and really anchors it into that conviction because, again, nobody said, as Mr. Castillo confessed, only David Ryman does. And the jury, to adequately judge whether or not he is trustworthy when he says, all right, you know, all these other things notwithstanding, he told me that he shot these people, that he did it. The jury has a right, when weighing all that other circumstantial evidence, to weigh whether or not there's any sort of bias or motive from Mr. Ryman, particularly in this case. That's my question to you. If we did not have Mr. Ryman at all in this case, just say Mr. Ryman didn't show up, wasn't there, never was confessed to anything, you're telling us that there is no way this defendant would have been found guilty without that? I'm saying it's arguably a reasonable probability that the outcome would have been different in this case. And I realize we're playing with different burdens here, but it's not just no way, it's a reasonable probability. But at this stage of the petition, it's arguably a reasonable probability. Is there an argument that can be made that this could have swayed a juror? I think it's the structure that we're working in here, at least with the standard of review. I realize that I'm hemming a lot to that arguable standard, but the Supreme Court has been very clear that when we're looking at a first-stage dismissal, as far as Strickland claims are concerned, we don't want to speculate too far. We just want to say, is it arguable that there is that reasonable probability? And I would say that there is. Did the State fully comply with the discovery in this case? I have no indication that they didn't or that they didn't. So they complied with the requirements of the statute regarding jailhouse snitches? The statute at the time, yes. There is a new statute that was just recently passed by the legislature that adds more requirements to the State, but obviously that statute, I think, is not in effect yet and obviously wasn't at the time. With regard to examining the prejudice that may have resulted, doesn't Davis v. Alaska stand for the proposition that if the record shows a jury has been made aware of adequate factors concerning the relevant areas of impeachment, that may be sufficient? That assumes, and I agree that that's the proposition, but that assumes that the relevant factors, that the jury understands all the relevant factors. One of the things that I think is important to keep in mind is that jurors, when they hear that somebody has been charged with burglary and received a seven-year sentence for being on that charge, they don't have any context unless there's a trained lawyer on the bench. Burglary may sound like a serious offense, but they have no idea of understanding exactly what it means in the grander scheme of things. So when they hear that the defendant got seven years in a burglary, they may think he really got hit hard. In reality, he got one year more than the minimum, correct? Or they may think that he got a lenient sentence, but in all likelihood, they don't have that context, and counsel sought to explain that context to them to fully argue and defend and impeach Mr. Ryan's credibility and cast doubt on his version of events. I think it's about painting the entire picture for the jury so that counsel, when he gets up to argue, can argue fully, and that's what was limited here. Well, Davis says we look at what the defendant was allowed to do as opposed to what he was not allowed to do. And here, it was clear to the jury this witness was a multiple convicted felon who was a jailhouse, quote-unquote, celly, who had severe issues with regard to memory and cooperation with the defense so that they knew that he was pretty much a witness that the state cast doubt in that court, right? I still don't think they had the complete picture, though, because they didn't see. Right. Well, the point of Davis is you look at what the defendant was allowed to do. Was there impeachment evidence on all of the factors? And the one factor that's missing for you is just the penalty range that he was facing. I think the factor that's missing is the bias and motive because whether or not he's a credible witness because he shipped his story is one factor, but his bias and motive in testifying was never explained. It goes beyond just understanding the range. It's what the range means. It means in his brain, what am I getting out of this? What do I stand to gain by coming forward with this information? And that's the factor that I think is important to keep in mind here. Yes, we're talking about a very specific fact, the sentencing range. Well, what does that fact mean to ensure? To follow up on what Justice Shostak said, similar to when we're examining a Brady violation, isn't the question whether or not there would be reasonable doubt about the defendant's guilt had this additional evidence not been considered? And if there is no justification or no doubt, then there's no justification for a new trial. Correct? Are we talking in the prejudice prong still? Yes. Because it feels like we're still just to make sure that I'm in the right. Yes. Well, I still think that that's blurring the burdens a little bit at this stage. I think that's— If our review is de novo on the court's dismissal and we look at all of the evidence in light of the error that you've identified, is there a reasonable probability that absent that error, if Ryman hadn't testified, is there a reasonable probability that the jury would have acquitted your client? Arguably, yes. I maintain that at the—arguably, it is. It's—I realize that I'm— Let me ask you this question, and maybe this might clear something up. What is it that you want us to do? The only relief that we seek is reinstatement to the second stage. This is the gist of a constitutional claim. This is not—and I don't think that this court can do anything other than that. There is some—and I admit I did a rather deep dive to understand when there's just a claim of ineffectiveness of appellate counts at the first stage, like how does the relief sort of go out, if I may have a few seconds to finish my thought. The reality is that I think the only relief that this court has permitted is to advance this to the second stage, working inside of the framework that the Supreme Court has handed down from Hodges and Tate. I can explain that more on rebuttal, but I'll reserve the balance of my time. Thank you. Good morning, Your Honors. Counsel. Before I begin the argument, I did want to point out that in the reply brief, we dispute something that defense has said, which is that we concede that it was a 30-year sentence that he was facing. I just wanted to make that clear. We're not conceding it. It's just at this stage, we're not getting into factual issues. In fact, the state disputed when that first came up that he had a residential burglary. That came up in a post-trial motion, and the state disputed that, in fact, he had that. So I guess we have a DOC copy in an exhibit by a defendant in his pro se PC that says he had these priors that would have mandated a class-X sentence. But, in fact, we don't know that that's true. And I'm just leaving it as our argument is the same no matter what. But we don't concede that he was facing 30 years, and he very well be 15. Well, if it was 30, that would put it in a different light, wouldn't it? No, Your Honor. Our argument is it doesn't at all. And the reason is sort of twofold, really. It's that we have ñ I mean, we're looking at a jailhouse snitch, and, of course, when you bring in a jailhouse snitch, you kind of know what you've got. But in this case, I would suggest that, in fact, maybe the state didn't know exactly what it was getting. There were so many factors that undermined his credibility. But the most important is the one that the state fronted. The state fronted that he had not only prior felony convictions, two of them, one for a forgery, which, of course, goes to his dishonesty. Another one was for, I believe, felony criminal trespass. But more importantly, they brought out that he was facing a charge of burglary at the time that he was in jail and that defendant. And at the time that he heard the confession, and at the time, which was 2011, I believe, by the time he went to the state to tell them that he had heard this confession, because the state fronted that he was not convicted until 2012. He was in jail. He was facing a pending charge. And, therefore, the jurors were well aware of exactly this fact, that there was leverage, if you will, that's what the case law calls it, of the state over the defendant, that he could have been swayed, trying to curry favor with the state. That was all there. What wasn't there and what there, the import of what was brought up at trial, is just that they didn't know the exact amount of years. But isn't the case law clear that when the state presents a witness to testify who has pending charges, the defense should have an opportunity, they're entitled to cross-examine him regarding his motivation to testify. So the judge cutting him off in this case, how is that not improper? Well, you know what, Your Honors, there's no case law to say that you have to allow the amount of years that they're facing. Obviously, they knew felony, they knew he got seven years. Now, obviously, they don't know whether that was a good deal or not a good deal. But that only comes into play. In fact, there had been some sort of deal, because otherwise it's speculation to say that what the defendant has told the jurors, that there was no deal and that the state actually stated to the court in questioning outside. On direct examination, did it come out that it was a plea agreement? I don't believe the record shows that the state fronted the fact that it was pursuant to an agreement. It was that he received seven years on a burglary, wasn't it? Your Honors, Your Honor, you might be right on that. I don't know that for a fact. On that point, are you saying in your brief that the trial court would have abused its discretion had it allowed cross-examination of the defendant, because it would allow the jury to speculate because the state and Ryman denied a deal? The triplet says the opposite. The defendant doesn't have to show there's been a promise or a deal. He's entitled to inquire whether the allegation of a promise is real or imaginary. Your Honors, I believe that goes to my forfeiture argument, and I do believe that what was presented to the judge below was very narrow. It was said over and over, and it was said pretty clearly, that they wanted to bring in that it was seven, that he got seven years and that it was 15 years, and that therefore there was an exercise of leniency that he actually got a deal and that that was to be presented to the jurors so the jurors could second-guess him, basically, could second-guess his testimony and decide that he was lying. That's the purpose it was brought in for. Now, should the judge have gone further and said, well, it's not allowable for that, but it's allowable for something else? He wasn't asked to admit it for any other purpose other than this very narrow purpose, and that in turn, because it's a forfeiture, then makes what the appellate attorney would have had to argue a little bit harder. At this point, obviously, we're looking at the prejudice prong in terms of whether there's a gist and whether there's arguable merit to that, but obviously the appellate counsel would have had a harder time because it wasn't broached in these terms. This first came out as, well, under Triplett or any manner of cases, we just want it in the amount of years so that this affected him when he was determining this and thinking about it, and the more years, the more likely he is to be trying to conjure up something. It wasn't presented as that. It was not. The court and the state and the defense counsel, I would submit, all understood it to be, we want to get in seven, even though he was facing 15, because it shows that there actually was a deal. In measuring prejudice, the way the state argues, the witness's credibility sheds light on the effect it may have had on the jury, correct? Yes, Your Honor. And in this case, the state, although they did acknowledge that Ryman was a convicted felon, argued fairly strenuously that the jury could accept what Ryman said because of the details that he offered that were not out in the public domain, correct? That is correct, Your Honor. We have several pages discussing why the jury should believe Ryman. Yes, Your Honor. I mean, obviously they brought in this witness for a purpose, and the purpose was to add to the evidence already against the defendant. So the thought was that even though he had baggage, and of course his baggage was not only his prior convictions, but also that he had this pending charge. And he changed his story. Well, exactly. And then because at the last minute he wouldn't talk to the state and pretty much said, I don't remember it now, I don't remember the details because I had seizures. Well, then certainly the state decided to go ahead anyway, but his credibility was already severely impaired, I would say. But what happened next was that he took the stand and was such a bad witness that in fact his credibility was totally undermined, and I think in a way that the state didn't foresee, which is that, first of all, the defense brought out some things, which it certainly had the right to do, which is that Ryman had been in jail with a person by the name of, I believe it was Richard Clark. And the defense suggested that wasn't that Michael Clark's, the victim's, one of the victim's brother, and so he could have learned the details from him. Now, that was never tied up in any way that I could see on this record, but certainly that was brought out to the jurors that he had spoken to this other man with the same last name who could be the brother of the victim, could have learned the details that way. The defense also brought out, as did the state, the fact that he said he had seizures, and the defense brought out that he had no medical record or anything to show that in fact he had had seizures. And now, of course, the defendant, excuse me, Ryman, admits that he made that up, that he did not, his seizures had never, not that he may have had seizures, but that seizures had caused him to have a memory loss. He admitted that he lied about that just the day or two before he's, you know, taking the stand here to testify for the state. They brought out, the defense brought out that he hadn't told his attorneys that there had been this confession to him, something that would be very important, that he waited six months to tell the state about it, that he had only met the defendant two weeks before this, they didn't know each other, and yet he's confessing murder to him. All these things that undermine his credibility. But Ryman's own testimony may have been kind of the nail in the coffin, if you will, in terms of how much he had to offer, because he himself not only admitted to lying about what he remembered and what he did remember in terms of the seizures, but when they asked him questions such as, did you not say this to our defense investigators, his answer was, and I quote, it's a possibility, they say a lot of things. And then he said, depending on the day, he had a headache, he didn't really want to be here, you know, that's kind of where his truth lies, apparently. And that could have been foreseen by the state, of course, but certainly the jurors heard all of that. So your argument is that when Paul Counsel was reviewing the record, it was not deficient performance to say, all right, there's not enough here. There's not enough here. I'm sorry, say that again, please. Your argument is that, is it not that when Appellate Counsel was evaluating the claims. Oh, correct. That based upon what's in the record already under Davis v. Alaska and other cases, given the amount of impeachment already there, this was a losing issue because of the overwhelming weight of the other evidence. Absolutely, that he's looking, you know, and we put forth that there is a forfeiture, so he'd be looking, or she, whoever the appellate attorney was, would be looking for ineffective assistance of counsel for not making this argument, this broader argument that it was relevant and it should be admitted for that purpose. And then they're having to look for, is there some type of prejudice? And in this case, not only do we have them fronting the very thing that we're talking about, the fact that he had pending charges, so that takes away from any argument in that sense. There were all these other facts that were brought out that undermined his credibility. And then additionally, we have just an incredible amount of evidence of this defendant's guilt, and that's the second factor here that shows that there's no possible way, no arguable merit to this because even without remnant's testimony, it doesn't matter. But should we be taking that deep of a dive here on a first stage dismissal? Well, you're looking for whether the record rebuts it. And now, you know, in a factual issue, that can be very simple. You know, does somebody say X happened, and you can see that, in fact, it didn't happen. But here we have a legal theory, and it doesn't rebut the legal theory. And I would suggest that, yes, you can look at it. Now, if it's, you know, there's a lot of evidence, but, of course, you know, you never know this. But this is sort of ironclad. This is a case that you don't see very often, which is that we have someone actually seeing the shooter, saw the defendant in his house. It was the child of a victim. Well, that identification was questionable, wasn't it? No, it was not, Your Honor. So, first of all, there was a suggestion that there was a suggested photo ID. But, you know, Your Honor's direct appeal said that, in fact, that it was not, you know, that that was not an effective assistance for not bringing that up, not making a motion on that. And I would suggest that was absolutely correct because, in fact, not only does it show that he had immediately identified the person, but he immediately identified this person by a number of facts which show that it was the defendant. He said he knew the person. He said this person had been at the wedding of his mother and her new husband. He said this person lived in Jamesville, which the defendant did. And he used the wrong name. He called him Blizz, which was a nickname. But Blizz was shown not to live in Rockford and not to tie up to some of these other factors because the child also said, we've seen him a couple times. I've seen his house from the outside. What did the facts show? The facts showed that the night before, when they were trying to get payment, the victims were trying to get payment from the defendant, they went to his house. The mother stayed outside with the kids. He saw, the child saw the house from the outside while the father went in, or not the father, excuse me, but the husband went in to talk to the defendant. He identified him, the child identified the defendant from the photo, said that the photo of Blizz was not him, said this is Blizz, and pointed to the defendant's photo, said he saw them at the time of the shooting from the side, not from the front. He was very clear that it wasn't from the front. But he saw him and he knew who it was. Now, how do we know that that's a good identification? Because the defendant left his phone at the scene. The defendant was there that night. It missed as much at a much later point. But he was there that night. And not only that, but we have cell phone technology, which shows us so many things. It shows us the defendant leaving Janesville at approximately, you know, somewhere before midnight. And his phone rings off towers that show him making a path to Rockford. It shows that the phone was used four times. And who used that phone? A.B. told the police, I used that phone to try to call the person he called, his dad, because he had seen his mother shot and killed as well as Michael Clark. There were also texts between the parties on it. Exactly, to show exactly what was going on. And A.B. even said there was somebody, you know, the defendant was coming that night to make a payment that was going to set his phone, give him minutes on his own phone. So we know what was happening. This was somebody coming to make a payment. That's what the defendant actually, you know, finally admits, too, that he did come for that purpose. And we know that the defendant did show up, was there, left his phone. A.B. picks it up, makes these four phone calls. The defendant acknowledged to the police that he owed the victims a substantial amount of money, correct? He did. He owed $2,500. I believe he said $3,400, $3,450, something of that sort that he brought with him to pay or that he owed anyway. So we have the phone coming with the defendant. We have the defendant, if I may finish, we have the defendant showing up at the timeline where this person, these two people were killed. We know that because we have the 911 call immediately after where the child runs next door. And then we have neighbors, one of whom sees, hears noise at 2 o'clock in the morning, right when this is happening, looks out, sees a boxy car that he identifies as an Olds 88 or a Cutlass. Well, lo and behold, when they go to arrest the defendant the next morning, they find him in the house of his girlfriend, an Oldsmobile 88, parked outside with a cover over a cardboard over the license plate, and his phone, the phone that was used for A.B., inside the car. All of this is tied together. And then we have his confession, or excuse me, his statement, which was not a confession but which could not have been more unbelievable. I was only in Janesville. Oh, okay, you had me on that. I was in Rockford. Oh, okay, but then I left. Oh, you know, how did he get my phone? And he must say at least three times because this catches him totally unawares. He had no idea that child had picked up his phone after he left. And then before he came back, the child was gone probably next door to make the report that his parents had been shot. And so he has no idea. And so he's blindsided by how did this child get your phone. I don't know. I don't even have my phone with me. I didn't come back until suddenly, oh, that's right, I came back. I saw dead people, but it was so mundane I didn't report it to anyone. Didn't even tell my girlfriend when I got back to the house. Well, if it was so mundane, then why didn't he tell the police in his statement? Does the record reflect how Ryman was discovered? Did he call the police or did they go looking for him? It does not really reflect that, I don't believe. And in answer to your other question that you asked, I don't believe that it shows that it was recorded. But it sounded from the record to me that it was Ryman who contacted somebody. Thank you, Your Honor. Next. Counsel said that this case was ironclad, which raises a question. If the other evidence in this case was ironclad, then why did the state bother with David Ryman in the first place? Because they did, I would argue, that that highlights that they wanted this evidence before the jury,  Confessions we know hold particular weight. And that's why there's prejudice in this case. If the rest of the evidence was ironclad, if there was no prejudice whatsoever, why would the state take the opportunity to put a gentleman, and a gentleman who keeps reversing his story, who is completely inconsistent, put him on the stand and take the time in the middle of a trial to have a pretrial hearing to determine what he's going to say and then hope that he says that exact same thing when the jurors come out? That's a good point. That's a good point. But does the state's evaluation of the production value of a single witness or actor in a case trump our de novo review? We look at all the evidence in light of the standard, in light of the standard, the Strickland standard, not whether or not the state made the right call putting this cellie on. How long have you been doing this, Counsel? Have I been doing what specifically? Practicing? Yeah. I've been a defense attorney for almost five years now. So most of the appeals that we get, or not most of them, but many of the appeals we get is because the state kind of does overkill sometimes. And when you ask that question, you know, why did they put it on, that's a great question. But I think sometimes as an assistant state's attorney, you think I just need one more thing or one more thing. And do you think if they let this one thing out, the outcome would have been any different? That was my question to you in the beginning. And if I may respond, I think that makes it arguably prejudicial. And that's the standard we're dealing with here. You're right. We're dealing with a de novo standard, but at the first stage of review. And I caution that at times this argument has drifted a little bit more towards weighing the evidence, which the Supreme Court has been very explicit that we're not supposed to do at this stage. And going back to your question earlier about what's the relief, well, we're still in the first stage here. Is there a gist of a constitutional showing? Is there arguably a claim of ineffective assistance of appellate counsel? It's a low standard. The Supreme Court has said this numerous times in Hughes and Tate specifically. Tate, I think, and I don't believe I cited Tate in my original brief, but Tate really sort of underscores the reason I didn't cite you. Tate dealt with ineffective assistance of trial counsel, but we know that the standards and the measures are the same. And some of these things, like the weighing of the evidence, if it's not affirmatively rebutted, affirmatively as in it's point blank rebutted, it's not frivolous or patently without merit, and it should be advanced to the second stage. Whether or not any of this stuff survives a substantial showing is a question for a different date. Right now we're just simply saying, is there the gist of a constitutional violation? And I would argue there are. There's a couple of things involved. You talked briefly, Justice, about appellate counsel's strategy, and specifically the deficient performance. There was only one case that I found that even remotely addressed this. This was after the fact. It was a People v. Makel. It's a First District case. The spot site is 358 L. App. 3rd, 102. It's from the First District in 2008. It was a first-stage dismissal. It also involved the reason it wasn't cited in my opening brief or my reply brief is because it involved a claim of ineffective assistance of trial counsel. But Makel sort of highlighted the fact that- Spell Makel. So M-A-K-I-E-L. My apologies. It highlighted the fact that if we want to know why appellate counsel didn't do a particular thing, we have to go to the second stage. The second stage is where post-conviction counsel could reach out to appellate counsel. Post-conviction counsel could say, well, why didn't you raise this? Appellate counsel could say, well, this is why. Post-conviction counsel could look at it and say, well, you know what? We don't have anything here. We have the gist of something. I can't make a substantial showing. I'm going to withdraw from the case, and the state could sustain a motion to dismiss. At this stage, the proceedings, though, it's a different standard. It's a lower bar. And I caution us from getting too far afield of that relatively limited scope that the Supreme Court has prescribed for us. Assuming that appellate counsel should have or might have raised the issue, you still have the prejudice problem, correct? Agreed. But that falls back to the idea that this was important. It could be considered overkill, but because arguably it could just have been considered important information anyway and not overkill, I think that it still moves beyond the first stage. So assuming it had been raised, you have to show the outcome that this Court probably would have or there's a reasonable probability that we would have reversed. From my interpretation of the prong, it has to be arguable that there's a reasonable probability that this Court would have reversed. To jam in a lot of words in there, I apologize. But I think that's the standard here. That's the way we're looking at it, right? Yes, that is correct. If there's nothing else, I thank you for your time and ask for this Court to reinstate Mr. Fitzgerald's petition for second stage proceedings. We'll thank the parties for their arguments. A written decision will be issued.